# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# JASPER DIVISION

| | |
|---|---|
| **JAMES EARNEST,** } | |
| } | |
| **Plaintiff,** } | |
| } | |
| v. } | Case No.: 6:19-cv-0771-MHH |
| } | |
| **ANDREW SAUL,** } | |
| **Commissioner of the** } | |
| **Social Security Administration,** } | |
| | |
| **Defendant.** | |

## MEMORANDUM OPINION

Pursuant to 42 U.S.C. §§ 405(g) and 1383(c), plaintiff James Earnest seeks judicial review of a final adverse decision of the Commissioner of Social Security denying his request for a period of disability and disability insurance benefits and supplemental security income. For the reasons stated below, the Court affirms the Commissioner's decision.

## I.   STANDARD OF REVIEW

The scope of review in this matter is limited. "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," a district court "review[s] the ALJ's 'factual findings with deference' and [her] 'legal conclusions with close

scrutiny.'" *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001)).

A district court must determine whether there is substantial evidence in the record to support the ALJ's findings. "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004). In making this evaluation, a district court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ. *Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citation omitted). If the ALJ's decision is supported by substantial evidence, a district court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin*., 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, a district court must determine whether the ALJ applied the correct legal standards. If a district court finds an error in the ALJ's application of the law or finds that the ALJ did not provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the district court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F. 2d 1143, 1145-46 (11th Cir. 1991).

## II.     STATUTORY AND REGULATORY FRAMEWORK

To be eligible for disability benefits, a claimant must be disabled. *Gaskin v. Comm'r of Soc. Sec.*, 533 Fed. Appx. 929, 930 (11th Cir. 2013). "A claimant is disabled if he is unable to engage in substantial gainful activity by reason of a medically-determinable impairment that can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months." *Gaskin,* 533 Fed. Appx. at 930 (citing 42 U.S.C. § 423(d)(1)(A)). A claimant must prove that he is disabled. *Gaskin*, 533 Fed. Appx. at 930 (citing *Ellison v. Barnhart,* 355 F.3d 1272, 1276 (11th Cir. 2003)).

To determine whether a claimant has proven that he is disabled, an ALJ follows a five-step sequential evaluation process:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel*, 631 F.3d at 1178.

"The claimant has the burden of proof with respect to the first four steps." *Wright v. Comm'r of Soc. Sec.*, 327 Fed. Appx. 135, 136-37 (11th Cir. 2009).

"Under the fifth step, the burden shifts to the Commissioner to show that the claimant can perform other jobs that exist in the national economy." *Wright*, 327 Fed. Appx. at 137.

## III.   PROCEDURAL HISTORY AND FINDINGS OF THE ALJ

Mr. Earnest applied for a period of disability and disability insurance benefits and supplemental security income on August 26, 2016. (Doc. 6-3, p. 12). Mr. Earnest alleges that his disability began November 10, 2015. (Doc. 6-3, p. 12). The Commissioner initially denied Mr. Earnest's claims on January 9, 2017, and Mr. Earnest requested a hearing before an Administrative Law Judge or ALJ. (Doc. 6-3, pp. 35-38). The ALJ issued an unfavorable decision on June 28, 2018. (Doc. 6-3, pp. 12-25).

In his decision, the ALJ found that Mr. Earnest has not engaged in substantial gainful activity since November 10, 2015, the alleged onset date. (Doc. 6-3, p. 14). The ALJ determined that Mr. Earnest was suffering from the following severe impairments: complex partial seizure disorder, degenerative disc disease of the thoracic and lumbar spine, unspecified depressive disorder, anxiety disorder/post-traumatic stress disorder (PTSD), and history of cannabis use/abuse. (Doc. 6-3, p. 14). The ALJ also determined that Mr. Earnest has a history of left shoulder injury that is a non-severe impairment. (Doc. 6-3, p. 14). Nevertheless, the ALJ concluded that Mr. Earnest did not have an impairment or a combination of impairments that

met or medically equaled the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Doc. 6-3, p. 14).

Given Mr. Earnest's impairments, the ALJ evaluated Mr. Earnest's residual functional capacity.  The ALJ determined that Mr. Earnest had the RFC to:

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: The claimant can occasionally lift and/or carry up to twenty pounds and frequently lift and /or carry up to ten pounds. He can stand and/or walk in combination, with normal breaks, for at least six hours during an eight- hour workday and he can sit, with normal breaks, for up to eight hours during an eight- hour workday. The claimant can occasionally climb ramps and stairs an should never climb ladders, ropes, or scaffolds. The claimant can occasionally balance, stoop, kneel, crouch and/or crawl. He can tolerate occasional (As term "occasional" is defined in the DOT) exposure to extreme heat, extreme cold, wetness, and humidity. He should not be required to work in areas of vibration. He should avoid exposure to industrial hazards including working at unprotected heights, working in close proximity to moving dangerous machinery, the operation of motorized vehicle and equipment, near large open bodies of water or near an open fire or flame. He can perform simple routine tasks requiring no more than short simple instructions and simple work related decision making with few work place changes. He can have occasional interactions with co-workers and supervisors with members of the general public. The claimant can adapt and respond appropriately to routine changes in the workplace.

(Doc. 6-3, p. 18).  Based on this RFC, the ALJ concluded that Mr. Earnest was not able to perform his past relevant work as a scrapper/salvage laborer, armed security guard, or screen printer. (Doc. 6-3, p. 23).  Relying on testimony from a vocational expert, the ALJ found that jobs existed in the national economy that Mr. Earnest could perform, including laundry classifier, router, and small parts assembler.  (Doc.

6-3, p. 24). Accordingly, the ALJ determined that Mr. Earnest was not disabled as defined in the Social Security Act. (Doc. 6-3, p. 25).

On March 20, 2019, the Appeals Council declined Mr. Earnest's request for review (Doc. 6-3. pp. 2-8), making the Commissioner's decision final and a proper subject of this Court's judicial review. *See* 42 U.S.C. §§ 405(g) and 1383(c).

## IV.   ANALYSIS

Mr. Earnest argues that he is entitled to relief from the ALJ's decision because the ALJ improperly assigned "very limited weight" to the opinion of Mr. Earnest's treating physician, Dr. Longmire, and the ALJ did not include each of his (Mr. Earnest's) impairments in her hypothetical questions to the Vocational Expert/VE.

### A.   Substantial evidence supports the ALJ's decision to discount Dr. Longmire's opinion regarding Mr. Earnest's ability to work.

"Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." *Winschel*, 631 F.3d at 1178-79 (citing 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2)). Absent "good cause," an ALJ must give the medical opinions of a claimant's treating physician "substantial or considerable weight." *Winschel*, 631 F.3d at 1179 (citing *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997), and 20 C.F.R. §§ 404.1527(d)(1)-(2),

416.927(d)(1)-(2)).  For good cause to exist, there must be a finding that the "(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Winschel*, 631 F.3d at 1179 (citing *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004)).  To make such a finding, an ALJ must evaluate: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other facts that tend to support or contradict the opinion.  *See* 20 C.F.R. §§ 404.15279(c), 416.927(c).  When an ALJ finds there is good cause to disregard a treating physician's opinion, the ALJ "'must clearly articulate [the] reasons for doing so." *Winschel*, 631 F.3d at 1179 (citing *Phillips*, 357 F.3d at 1240-41).

Here, the ALJ gave very limited weight to the opinion of Dr. David Longmire, a neurologist who treated Mr. Earnest between November 10, 2015, and October 23, 2017.  (Doc. 6-3, p. 20; Doc. 6-10, pp. 5, 30).  In a handwritten note on letterhead dated August 31, 2016, Dr. Longmire opined:

> The above[-]named patient [Mr. Earnest] continues to have symptoms of complex partial seizures, reduced levels of consciousness, secondarily generalized tonic-clonic seizures, and sleep disorder, all of which make it impossible for him to perform any effective or sustained work. Therefore, it is my medical opinion that he shall be allowed to apply for assistance through food stamps.

(Doc. 6-10, p. 33). In evaluating Dr. Longmire's opinion and concluding that she would not give substantial weight to the opinion, the ALJ considered the factors provided in the applicable Social Security regulations. The ALJ explained:

> The claimant alleged and testified that he was unable to work because epilepsy/seizure disorder (Exhibit 1E and Hearing Testimony). However, the severity of his complaints were not persuasive as they were unsupported with the evidence of record. The claimant received treatment for his seizures from neurologist David Longmire, M.D. from November 10, 2015 until October 23, 2017. During his treatment, he underwent numerous neurological examinations. With the exception of the claimant's first examination on November 10, 2015 where it was found that he had a tremor in his right hand, his neurological examinations were unremarkable. His gait and station were normal; he had normal motor strength in his upper lower extremities; and his orientation, memory, and attention were normal. Moreover, the claimant underwent numerous diagnostic tests that were all normal. On November 18, 2015, he underwent an electroencephalogram (EEG) and Nerve Conduction Study/EMG that were normal. He underwent another EEG on May 18, 2016 that was again normal, and three weeks later, on June 1, 2016, he underwent an MRI of his brain that was also normal (Exhibits 1F, 3F, 8F, and 9F).
>
> As a precaution, Dr. Longmire prescribed the claimant medication for his seizures and once the claimant was placed on the right medication, he went months without having any seizures. On the claimant's January 21, 2016 visit with Dr. Longmire, he stated hat he had not had seizures in the last three and a half months. On his April 28, 2016 visit, he stated that he had not had any seizures in the last six and a half months. On December 5, 2016, he stated that he had not had a seizure since August (Exhibits 3F, 8F, and 9F). Notably, when the claimant did have a seizure, it appeared that they were brought on by stress. The claimant informed Dr. Longmire on his October 23, 2017 visit that he had a seizure in September due to family stress (Exhibit 9F). Additionally, the treatment records at Winfield Behavioral Health showed that the claimant's seizures were well controlled. The claimant received treatment at Winfield Behavioral Health on March 27, 2017 where he stated that he had been seizure free for three months and that he was going to get his driver's license back and be able to drive (Exhibit 7F).

> Dr. Longmire completed a Medical Source Statement on August 31, 2016 whereby he opined that it would be impossible for him to perform any effective or sustained work (Exhibit 3F). In having reviewed his opinion in conjunction with the other evidence of record, the undersigned finds that the evidence of record does not support his opinion. Dr. Longmire completed this Medical Source Statement in order for the claimant to receive food stamps not for purposes of social security disability. The process for applying for both are very different and from a disability standpoint only, the undersigned finds that his opinion was generally unsupported and inconsistent with his documented response to treatment with medication.

(Doc. 6-3, pp. 19-20).

Mr. Earnest's medical records support the ALJ's analysis. According to Mr. Earnest's medical records, Dr. Long referred Mr. Earnest to Dr. Longmire for back pain, tremors, and seizures following a car accident. (Doc. 6-9, pp. 5, 7; Doc. 6-10, p. 3). Mr. Earnest complained of seizures which he described as jerking and blank stares. He reported that his last seizure had been one month earlier and that he was not on mediation. Mr. Earnest complained of occasional tremors in his right hand and constant tremors in his left leg. He reported that he had experienced lower back pain for three to four years. (Doc. 6-10, p. 7).

Dr. Longmire's treatment notes indicate that Mr. Earnest had no acute distress or edema and that Mr. Earnest's gait, strength, and tone in his extremities were normal, except that Mr. Earnest had a right-hand tremor. A neurological exam revealed Mr. Earnest's orientation, memory, attention, language, and knowledge were normal. (Doc. 6-10, p. 7). Dr. Longmire initially diagnosed lumbar radiculopathy, complex partial seizures, secondarily generalized seizures, and

9

tremor. (Doc. 6-10, p. 5). Dr. Longmire scheduled Mr. Earnest for an Electroencephalogram (EEG) and Nerve Conduction Study/EMG (EMG/NCV) on November 18, 2015 to investigate Mr. Earnest's low back pain and seizures. (Doc. 6-10, pp. 4-5).

After the EEG and EMG tests, Mr. Earnest returned to Dr. Longmire on November 23, 2015. Mr. Earnest reported that he had not had a seizure in six weeks, but his lower back pain and tremors persisted. (Doc. 6-10, p. 9). Dr. Longmire reviewed the results of the EEG and EMG/NCV with Mr. Earnest, prescribed him Neurontin for seizures and Tylenol #4 for pain, and scheduled him for an MRI of his spine. (Doc. 6-10, p. 9). Dr. Longmire explained to Mr. Earnest that the EEG was normal and noted that Mr. Earnest was awake with spontaneous drowsiness during the procedure. (Doc. 6-10, p. 9). The NCV test was within normal range bilaterally, and the EMG showed "minimal scattered fibrillations throughout the muscles in both lower extremities, with <u>no</u> <u>clearly</u> <u>defined</u> evidence for lumbar or lumbosacral radiculopathy." (Doc. 6-10, p. 11) (emphasis in medical record).

On December 4, 2015, Mr. Earnest had an MRI of his lumbar spine without contrast. (Doc. 6-10, p. 16). The test indicated that Mr. Earnest had a possible fracture or degenerative issue. (Doc. 6-10, p. 16). The MRI notes state: "There is irregularity anterior aspect of the L2 endplate with considerable bone marrow edema within L2 vertebral body. Findings may reflect degenerative although if the patient

has had recent trauma, this could reflect an acute endplate fracture. The conus is unremarkable." (Doc. 6-10, p. 16).

Mr. Earnest next visited Dr. Longmire on January 21, 2016. (Doc. 6-10, p. 14). Mr. Earnest reported that he had not had a seizure in three and a half months, but he continued to complain of lower back pain. (Doc. 6-10, p. 14). Dr. Longmire noted that Mr. Earnest had full active range of motion in all extremities. (Doc. 6-10, p. 14).

On April 28, 2016, Mr. Earnest visited Dr. Longmire for a check-up. Mr. Earnest reported he had not had a seizure for six and a half months but continued to experience lower back pain. (Doc. 6-10, p. 17). Dr. Longmire gave Mr. Earnest a refill of the medication Neurontin and again noted that Mr. Earnest's musculoskeletal and neurological exams were normal and that he had a full active range of motion in all four extremities. (Doc. 6-10, p. 17-18).

After waiting for an appointment, on May 16, 2016, Mr. Earnest saw Dr. Longmire. (Doc. 6-10, p. 19). Mr. Earnest reported that he was having blank staring spells that had been going on a few months; however, Dr. Longmire noted that Mr. Earnest had not mentioned these symptoms at his previous appointment in April. (Doc. 6-10, p. 19). Mr. Earnest also reported trembling, rubbing his fingers, chewing his lips and tongue, and memory loss. (Doc. 6-10, p. 19). Dr. Longmire added

Depakote as a seizure medication and ordered another EEG for June 1, 2016. (Doc. 6-10, p. 22).

On June 9, 2016, Mr. Earnest had a follow-up visit with Dr. Longmire to receive the results of the MRI and EEG. (Doc. 6-10, p. 25). Dr. Longmire noted Mr. Earnest did not tolerate Depakote and that he had changed Mr. Earnest's seizure medication to Topamax. (Doc. 6-10, p. 25). Mr. Earnest reported that when he first used Topamax, he had one or two seizures, but he had not had a seizure since. (Doc. 6-10, p. 25). Dr. Longmire reported that the "EEG is well within normal limits." (Doc. 6-10, p. 27). He also reported that Mr. Earnest had an open MRI of the brain with no contrast, and the MRI was normal. (Doc. 6-10, pp. 24-25). Mr. Earnest's musculoskeletal and neurological exams were normal, and Dr. Longmire noted Mr. Earnest had full active range of motion in all four extremities. (Doc. 6-10, p. 26).

On August 25, 2016 Mr. Earnest reported three seizures with nausea and vomiting on August 14, 2016 and one seizure with vomiting on August 23, 2016. (Doc. 6-10, p. 31). Dr. Longmire indicated that Mr. Earnest's musculoskeletal exam was normal with no tremors, and his neurological exam was normal. (Doc. 6-10, p. 31).[1]

---

[1] The ALJ properly concluded that Mr. Earnest's seizure activity does not meet Listing 11.02. (Doc. 6-3, p. 16).

These medical records support the ALJ's decision to find good cause to give Dr. Longmire's opinion regarding Mr. Earnest's ability to work less than substantial weight. Mr. Earnest's testimony at his administrative hearing also supports the ALJ's decision. At the hearing, Mr. Earnest testified that he last worked doing manual labor in 2015. He left work following a car accident in which he sustained a fractured clavicle and shortly after which he began to have seizures. (Doc. 6-3, pp. 65-66). Mr. Earnest testified that Dr. Longmire placed him on "a couple of different medications. So far the Topamax . . . has worked best." (Doc. 6-3, p. 67). He stated that he was taking his medication the way it was prescribed and that since taking the medication, he had had only had one grand mal seizure. (Doc. 6-3, p. 67). He stated that his mother said that he had absentee seizures about once or twice a month. (Doc. 6-3, p. 68). And his roommate had observed absentee seizures, but his roommate usually could bring him out of a seizure by talking to him. (Doc. 6-3, p. 68). Mr. Earnest stated: "Dr. Longmire told me stress is probably what brings the seizures on." (Doc. 6-3, p. 70).

Mr. Earnest argues the ALJ rejected his treating physician's opinion regarding his ability to work solely because Dr. Longmire provided the opinion to support Mr. Earnest's application for food stamps. (Doc. 11, p. 12). He contends, "the ALJ concluded that the Medical Source Statement of the claimant's treating physician . . . was unreliable or unworthy simply because it was on a food stamp form!" (Doc.

13

11, p. 13). Mr. Earnest asks the Court to consider the Eleventh Circuit's opinion in *Miranda v. Comm'r of Soc. Sec.*, 454 Fed. Appx. 717 (11th Cir. 2011). In *Miranda*, the plaintiff argued the ALJ erroneously failed to give controlling weight to the opinion of the plaintiff's treating psychiatrist that the plaintiff's major depressive disorder prevented him from working. *Miranda,* 454 Fed. Appx. at 719. The Eleventh Circuit found that substantial evidence supported the ALJ's decision to discount the psychiatrist's statement, "which was made in a form used to request food stamps," because the statement was inconsistent with the psychiatrist's treatment notes and other evidence in the record. *Miranda,* 454 Fed. Appx. at 719. Mr. Earnest correctly notes that the Eleventh Circuit did not discount the psychiatrist's statement because it was provided in a form used to request food stamps. (Doc. 11, p. 13). But, as in *Miranda*, the ALJ here properly discounted Dr. Longmire's opinion in support of Mr. Earnest's food stamp application because the opinion was inconsistent with Dr. Longmire's treatment records for Mr. Earnest. The ALJ did not give limited weight to Dr. Longmire's opinion "simply because it was on a food stamp form!" (Doc. 11, p. 13).

Based on Mr. Earnest's medical records and his description of his ability to control his seizures with medication, the Court concludes that substantial evidence supports the ALJ's decision to discount Dr. Longmire's opinion regarding Mr. Earnest's ability to work. *See Crawford*, 363 F.3d at 1159 (finding that treating

physician's opinion that the claimant was totally and permanently disabled was unsupported by the medical evidence and inconsistent with the physician's treatment notes); *see also Zuba-Ingram v. Comm'r of Soc. Sec.*, 600 Fed. Appx. 650, 654-656 (11th Cir. 2015) (affirming an ALJ's decision that accorded "very limited weight" to the opinion of a treating physician, who opined that the plaintiff had been unable to work for some time, because the opinion was inconsistent with the record).[2]

### B. The ALJ's Hypothetical Questions Included All of Mr. Earnest's Impairments.

For the testimony of a vocational expert "to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments." *Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002). An ALJ does not have to "include findings in the hypothetical that the ALJ [has] properly rejected as unsupported." *Crawford*, 363 F.3d at 1158. "The hypothetical need only include the claimant's impairments, not each and every symptom of the claimant." *Ingram v. Comm'r of Soc. Sec.*, 496 F.3d 1253, 1270 (11th Cir. 2007).

---

[2] Mr. Earnest concedes that the evidence shows that his seizures were well-controlled with medication and that his EEGs, nerve tests, and MRIs were normal. (Doc. 11, p. 15). But he argues that "Dr. Longmire's opinions still matter." (Doc. 11, p. 15). Mr. Earnest is not wrong. Because he was Mr. Earnest's treating physician, Dr. Longmire's opinions do matter. The ALJ discounted only one of Dr. Longmire's opinions, the opinion relating to the food stamp application. (Doc. 6-3, p. 20). Throughout her decision, the ALJ she considered Dr. Longmire's opinions from his treatment notes, and she gave greater weight to those consistent notes than to Dr. Longmire's lone opinion regarding Mr. Earnest's ability to work. (Doc. 6-3, p. 19-20, 22).

15

Mr. Earnest argues that the ALJ erred because she did not include each of his limitations in her hypothetical questions to the VE. (Doc. 6-3, p. 20-21). First, he argues that "Dr. Longmire says that stress brings on [Mr. Earnest's] seizures," yet there was no low stress requirement in the ALJ's hypothetical questions to the VE. (Doc. 11, p. 15). Mr. Earnest points out that the ALJ asked hypothetical questions to the VE that required the VE to "assume an individual who can perform simple routine tasks requiring no more than short simple instructions and simple work related decision making few work place changes," without taking into account that even these jobs can cause stress. (Doc. 11, p. 15). On another record, Mr. Earnest night have a point, but he has not identified a medical record that contains an opinion that stress causes his seizures, and the Court has not found one. In one treatment record, dated October 23, 2017, Dr. Longmire noted that Mr. Earnest had "family stress" the week that Mr. Earnest reported he had a seizure. (Doc. 6-10, p. 88). There is no record that indicates that Dr. Longmire attributed Mr. Earnest's history of seizures to stress.

Similarly, Mr. Earnest contends the ALJ assigned limited weight to Dr. Haney's opinion that Mr. Earnest's ability to work appeared to be moderately to severely impaired due to chronic emotional limitations. (Doc. 11, p. 15). Mr. Earnest points out that his "emotional limitations do not cause severe functional limitations per se," but he argues that his low tolerance for stress makes him "especially

16

susceptible to seizures." (Doc. 11, p. 16). Again, Mr. Earnest does not support this argument with evidence from the record. Dr. Haney addressed Mr. Earnest's emotional limitations, stating,

> Mr. Earnest will probably continue to require assessment and treatment of chronic emotional difficulties. He should continue to benefit from mental health counseling and medication. Ability to function in work settings appeared moderately to severely impaired due to chronic emotional limitations. The claimant's condition will probably remain unchanged in the next six to twelve months. All of Mr. Earnest's statements were regarded as truthful.

(Doc. 6-10, p. 52). Dr. Haney did not indicate if or how stress affects Mr. Earnest's seizures, and evidence of Mr. Earnest's emotional limitations does not bridge the gap and establish a link between stress and seizures. Aside from Mr. Earnest telling Dr. Longmire that he thought one of his seizures was caused by family stress, Mr. Earnest has no medical evidence to show that his seizures are stress-induced.[3] Therefore, the ALJ's hypothetical questions to the VE were proper because they included all of Mr. Earnest's confirmed limitations.

## V.   CONCLUSION

For the reasons outlined above, the Court finds that the ALJ's decision is supported by substantial evidence, and the ALJ applied proper legal standards. The

---

[3] The ALJ's decision includes the following statement: "Notably, when the claimant did have a seizure, it appeared that they were brought on by stress. The claimant informed Dr. Longmire on his October 23, 2017 visit that he had a seizure in September due to family stress (Exhibit 9F)." The ALJ overstates the causal relationship between stress and seizures. Again, the only medical record linking the two is a record in which Mr. Earnest attributed a seizure to a time of family stress. There is no medical evidence that indicates a causal link.